IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**BRENDA WALLIS**,                                                Civil Case No. 09-1112-KI

               Plaintiff,

                                           OPINION AND ORDER

   vs.

**COMMISSIONER of Social Security**,

               Defendant.


      David B. Lowry
      9900 SW Greenburg Road
      Columbia Business Center, Suite 130
      Portland, Oregon  97223

            Attorney for Plaintiff

      Dwight C. Holton
      United States Attorney
      District of Oregon

Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon  97204

Leisa A. Wolf
Social Security Administration
Office of General Counsel
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington  98104

       Attorneys for Defendant

KING, Judge:

Plaintiff Brenda Wallis brings this action pursuant to section 205(g) of the Social Security

Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").  I reverse the decision of the Commissioner and

remand for further proceedings.

## BACKGROUND

Wallis filed applications for DIB and SSI on January 10, 2006.  The applications were

denied initially and upon reconsideration.  After a timely request for a hearing, Wallis,

represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on

February 9, 2009.

On May 13, 2009, the ALJ issued a decision finding that Wallis was not disabled within

the meaning of the Act and therefore not entitled to benefits.  This decision became the final

decision of the Commissioner when the Appeals Council declined to review the decision of the

ALJ on July 31, 2009.

Page 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which

Page 3 - OPINION AND ORDER

significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).  Substantial evidence is more than a "mere scintilla" of the evidence but less than

a preponderance.  Id.  "[T]he Commissioner's findings are upheld if supported by inferences

reasonably drawn from the record, and if evidence exists to support more than one rational

interpretation, we must defer to the Commissioner's decision."  Batson v. Comm'r of Soc. Sec.

Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ noted that Wallis had earned $12,672.88 in 2007, but that he would continue the

analysis to determine her impairments during the entire period at issue.  He concluded Wallis had

the severe impairment of fibromyalgia.  He concluded any of her mental impairments were non-

severe.  The ALJ also noted that fibromyalgia is not included in the Listing of Impairments in 20

C.F.R. § 404, Subpart P, Appendix 1.

The ALJ found the following regarding Wallis's' limitations:  she was capable of lifting

and/or carrying 20 pounds occasionally and ten pounds frequently; she could stand and/or walk

and could sit about six hours in an eight-hour day; she could push and pull without limits; she

could occasionally stoop, crouch, crawl, kneel, and climb ramps or stairs; she should not climb

ladders, ropes or scaffolds; she should not be exposed to temperature extremes, humidity,

wetness or vibration; and she was limited to occasional overhead reaching.

As a result of these limitations, after hearing the testimony of a Vocational Expert

("VE"), the ALJ found Wallis capable of performing her past relevant work as a cashier, grocery

store cashier, billing clerk, buyer, and service desk clerk.

## FACTS

Wallis, 48 years old at the time of the ALJ's decision, alleged disability beginning August

16, 2002.  She sought treatment from the Old Town Clinic in May of 2002, complaining of

recurrent neck pain and headaches. She reported a Kaiser rheumatologist had diagnosed her with fibromyalgia in 1996. The next month, she reported her back was better and that she had been doing some yard and garden work. The following month, she complained of edema in her extremities. L. Eddy, FNP, Ph.D., examined her and found seven of eight tenderpoints and provided a prescription for Ultram.

On March 26, 2003, Wallis sought urgent care at Good Samaritan Hospital for congestion, productive cough and right ear pain. She reported diagnoses of fibromyalgia and asthma.

On December 26, 2003, Wallis went to the St. John Medical Center's Emergency Department for a cough, sinus pain, fever, chills and muscle aches. She described the illness as "severe." Tr. 539. She reported mild diarrhea for the past two days and a moderate headache.

Mark Livingston, M.D., treated Wallis with antibiotics on October 19, 2005 for a cough, which he diagnosed as bronchitis with known asthma. At the same clinic, on November 23, 2005, Marykay Lehman, M.D., reported that Wallis initially made the appointment for treatment of a cough and congestion. When Wallis arrived "she stated that she really needed refills on her Vicodin and Ultram, which she has been using for her 'fibromyalgia and overactive intestines.'" Tr. 488. Wallis contended that Dr. Livingston had increased her medication doses at her last visit, which is why she was entitled to refills. Dr. Lehman noted the medications were not on Wallis's medication list and there was no discussion in Dr. Livingston's notes about increasing the dosages. Dr. Lehman prescribed Protonix for the reflux symptoms, but refused to refill the narcotics. The pharmacy reported the Vicodin prescription had been filled on November 7, 2005 (and was to last 30 days) and the Ultram was refilled on November 19, 2005 (to last 30 days).

Dr. Lehman "went over this in detail and stated:  #1 she is not due for a refill yet for either of these medications, and #2 I did not think these are the kind of medications that would be beneficial for her current symptoms.  She became very angry and stated that we were lying and she was very upset."  Tr. 490.

Dr. Livingston reported on December 1, 2005 that Wallis was complaining of increased pain in her hands from swelling and pain in her low back.  She had a part-time job.  She became:

> acutely agitated when I informed her that she may be terminated from this clinic. She feels that it is unjustified, that her behavior was provoked by the pharmacist and the physician accusing her of not being honest.  She has gone through a cycle many times of trying to establish care with doctors and having them not believe that she has chronic pain.

Tr. 487.  Dr. Livingston changed her prescription from Vicodin to Norco.

He treated Wallis with a nebulized dose of DuoNeb on December 13, 2005 for wheezing and chest tightness.  She signed a pain contract verifying that she would not receive Vicodin from the clinic.  Dr. Livingston also informed her she would need to obtain a new primary provider as he was leaving the clinic.

Eric T. Hansen, M.D., treated Wallis for pseudogout on her left knee from January 22, 2007 through March 26, 2008.  She obtained a cortisone injection in January of 2007 and by February her pseudogout had "completely resolved."  Tr. 546.  In November of 2007, Wallis returned to Dr. Hansen complaining of knee pain.  Dr. Hansen noted the x-rays showed "a complete loss of joint space on the lateral side of her knee."  Tr. 545.  He commented that she enjoyed fishing, walking, dancing, and was on her feet quite a lot employed as a housekeeper. She denied any other significant diseases or injuries.  Dr. Hansen considered a total knee replacement, but suggested that at her young age, he wanted to delay such a surgery for as long as

possible.  He recommended an unloader brace, but she could not afford one and it was not

covered by her insurance.  David Maligro, PA-C, provided another cortisone injection on

February 25, 2008.  Wallis requested Vicodin from Dr. Hansen on a number of occasions, which

he provided initially and then subsequently instructed her to obtain from her primary provider.

Wallis established care with Janet Kelly, M.D., in January 2007.  Dr. Kelly treated Wallis

for congestion, ear pain, and coughs on a number of occasions.  In December 2007, Dr. Kelly

prescribed Zydone for the pain in Wallis's knees.  Later that month, Wallis reported neck

tightness from "2 or 3 injures from car accidents" and complained the Zydone was not helping

her pain.  Dr. Kelly commented that Wallis was "very insistent on a higher dose of medication.

Her neck is positive for hypersensitivity to fine touch, but there is a moderate amount of muscle

spasm as well."  Tr. 553.  Dr. Kelly added Skelaxin to the Zydone, but she refused to increase the

dosage because of Wallis's alcohol and methamphetamine history.  A spine x-ray showed mild

degenerative-disk change.

On April 24, 2008, Dr. Kelly treated Wallis for a swollen right thumb caused by Wallis's'

work doing data entry at a new job.  Wallis reported her medications were stolen as well as

money from her purse.  Her Zydone refill was due on May 7.  Dr. Kelly gave her samples of

Celebrex, but did not provide an early refill of the Zydone.

Dr. Kelly saw Wallis on May 29, 2008 for GERD and an early refill on the Zydone

because she was going out of town for work.  She refilled the Zydone prescription but

underscored that the next refill would be July 5, 2008 or later.  Wallis returned on June 10, 2008,

complaining of lower back pain; due to liver function abnormalities, Dr. Kelly switched Wallis to

Vicoprofen.  Wallis returned on July 1, 2008 with sinusitis.  On July 8, 2008, she returned with

problems of fatigue and back pain hypothesizing she had an STD.  On August 7, 2008, she

reported her pain medication was not working and that she was afraid no one cared.  On August

12, 2008, she returned complaining of swelling in her left knee; the pseudogout had returned and

the nurse practitioner recommended icing the knee.  When Wallis returned on August 27, 2008

for a follow-up she reported feeling "pretty good."  Tr. 604.  She wondered about taking anti-

depressants and switching to a pain medication that she needed to take only twice a day.  Dr.

Kelly switched her to Oxycodone.

On September 1, 2008, Wallis was tearful, in pain and depressed.  Dr. Kelly initiated

Lithium to treat Wallis's depression.  On September 16, 2008, Wallis returned for a follow-up on

her pain; she complained the Lithium made her too sleepy to function, but she simultaneously

complained of not sleeping well.  Dr. Kelly injected three trigger points with lidocain and the

pain was improved.  She prescribed Trazadone for insomnia.  On September 23, 2008, Wallis

wanted off narcotics, said she threw away her Oxycodone and wanted to try Lyrica.

On September 30, 2008, Wallis said the Lyrica was "helping the pain but notes arms and

legs swelling[;] wonders if from Lyrica."  Tr. 596.  In talking with Dr. Kelly, however, she

reported she "thinks the swelling may have been from the heat.  Today, both the itching and

edema are gone.  She is very happy with the Lyrica.  She can move her head now from side to

side and back and forth.  She hasn't been able to do this for years."  Id.  Dr. Kelly then noted,

"Fibromyalgia pain much relieved with Lyrica."  Tr. 597.

On October 13, 2008, she reported having a stomach flu with vomiting and diarrhea.  She

was hired for a two week job, working 12 hour shifts.  She asked for Vicodin to help with the

pain.  On October 28, 2008, she reported pain and money worries were causing anxiety.  She

Page 9 - OPINION AND ORDER

"needs to have someone listen to her needs. When providers don't listen her depression is profound. She may spend days in bed without eating or drinking so her pain and anxiety worsen." Tr. 593. On October 31, 2008, she called to say the Celebrex was working great. On November 6, 2008, she had stopped taking Celebrex because it was upsetting her stomach; she also said it made her "goofy." Tr. 590. The Lyrica gave her suicidal thoughts. On November 13, 2008, she changed from Percoset to Oxycodone. She complained on December 1, 2008 of constipation with the Oxycodone and switched to Vicodin. She switched back to Oxycodone on December 9, 2008. On December 19, 2008, she reported the Oxycodone made her pain worse. She switched to Norco and agreed to make no pain medication changes for three months; she also started Zyprexa for her depression. The pharmacy called saying Wallis had just filled a prescription for Norco on December 1, 2008, and the nurse practitioner instructed the pharmacist not to fill the prescription given that day and that Wallis could not have a refill until January 1, 2009.

On January 20, 2009, the nurse practitioner reported Wallis "cannot work at a job where she needs to walk any distance. Her knee is too damaged." Tr. 579.

Several physical and mental evaluations were completed of Wallis's condition.

On May 8, 2003, Frank Lahman, Ph.D., concluded Wallis had the following disorders: organic mental, somatoform, personality, and substance addiction. He concluded none of these were severe impairments.

On May 8, 2003, Linda Jensen, M.D., opined Wallis could frequently lift 10 pounds, could stand/walk about six hours, could sit about six hours, and could push and pull. Her main limit was the need to change her posture. In support of her opinions, Dr. Jensen referenced

Wallis's ability to perform yard and garden work and attend classes for a medical assistant degree.

Elyse Berkovitch, PT, M.B.A., examined Wallis on two consecutive days in early August 2005 to evaluate Wallis's "overall ability to work at any occupation, as well as a job matching comparison with a generic Medical Assistant job." Tr. 448. After testing, Berkovitch concluded Wallis was limited to only occasionally performing: overhead lifting; elevated work with the right upper extremity; and repetitive squatting, crouching and stooping. Berkovitch concluded Wallis could perform light work.

Jill E. Spendal, Psy.D., examined Wallis on August 9 and again on August 26, 2005. Dr. Spendal noted that Wallis was reluctant to participate and was not forthcoming about some of her history. Wallis's score on the Minnesota Multiphasic Personality Inventory–2nd Edition indicated "the possibility of a strong psychological component to the physical health problems." Tr. 465. Dr. Spendal diagnosed Pain Disorder Associated with Both Psychological Factors and a General Medical Condition, Major Depressive Disorder, moderate, that follows the course of her pain levels on Axis I, Personality Disorder, NOS, borderline and histrionic features on Axis II, with a Global Assessment of Functioning at 60.[1] Dr. Spendal commented that Wallis's "Working Memory and visual Processing Speed both fall in the Low Average range; weaknesses

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 51 to 60 means "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)." The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV"). A GAF of 61 to 70 means "**Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**." Id.

in these areas are not uncommon in individuals with chronic pain, as pain can decrease concentration which negatively influences both attention and processing speed." Tr. 465. Dr. Spendal further commented Wallis might require: an extended training period to make sure information was not presented too quickly; that information be repeated; training by listening, watching and doing; and a supervisor to give feedback on relationships at work. These suggestions arose out of Dr. Spendal's finding that Wallis had "mild attention problems." Tr. 467-68. Dr. Spendal remarked Wallis would need to "work with her medical provider to document any physical workplace limitations she has due to her Fibromyalgia and pain." Tr. 469.

Susanne Linn, M.Ed., LPC, who provided weekly therapy to Wallis, opined that after a year of treatment, Wallis's emotional state had not improved–she moved from happy, angry and weeping several times in one session. Linn commented that Wallis was "trying hard to maintain a job that will provide income for her but is not capable of doing so." Tr. 495.

Bill Hennings, Ph.D., completed a Psychiatric Review Technique form on April 12, 2006. He believed Wallis's psychological impairments were not severe. He opined the medical record showed her symptoms were fairly well-controlled with consistent treatment and medications.

After the ALJ's decision, on March 30, 2009, Alyce Huntsinger, ARNP, opined that Wallis could stand and walk about three hours in an eight-hour day, and could sit about three hours in an eight-hour day. She also thought Wallis would need to lie down three to four times a day. She believed Wallis's left knee and degenerative disc disease supported her findings. She believed Wallis would miss work about four times a month.

# DISCUSSION

I.    <u>Disallowance of Lay Witness Testimony</u>

Wallis argues the ALJ erred in precluding her from presenting the testimony of two lay

witnesses.  The issue was presented at the hearing as follows:

> ALJ:  All right. Mr. Lowry, your list indicates you have a couple witnesses. Do you
> expect them to provide any different answers than what we've already heard?

> ATTY:  Well, we've done this before so I think you know what I
> ask witnesses.

> ALJ:  Well, there's no reason to go through the same questions and get the same
> answers. Is that all we're going to do?

> ATTY:  Well, we're going to go through one, two, three, four, five, six subjects and I
> expect that testimony would be corroborating evidence for the claimant. We have --

> ALJ:  Okay. Do you expect to elicit any different information than what we already
> have?

> ATTY:  Probably not.

> ALJ:  Okay. We'll forgo those witnesses then.

Tr. 48.  Wallis contends the ALJ's actions not only violated the ALJ's own duty to complete the

record and comply with the regulations to consider evidence from lay witnesses, but it also

violated Wallis's due process right to present evidence.

I find the ALJ acted appropriately under the law in limiting cumulative evidence.  <u>See</u> 5

U.S.C. § 556(d) (ALJ may exclude "unduly repetitious evidence").  Wallis's counsel did not

object to the ALJ's decision, did not explain how the testimony would elucidate the issues and

instead confirmed it would be cumulative, and did not submit the testimony in writing even

though the record remained open 30 days after the hearing.  The ALJ did not err.

II.    Severity of Impairments

Wallis argues the ALJ should have considered her knee pain, incontinence, pain and personality disorders, headaches, shoulder pain, neck/cervical impairment, and asthma to be "severe" impairments.  The ALJ concluded Wallis only had the severe impairment of chronic pain with fibromyalgia.  He also separately concluded Wallis's depression was not a severe impairment.  He did not consider whether any other ailments qualified as severe impairments.

The threshold at step two is a low one.  The analysis consists of determining whether the impairment significantly limits a claimant's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  It is a "de minimis screening device [used] to dispose of groundless claims."  Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (internal quotation omitted).  "An impairment that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities."  SSR 96-3p.

A.    Knee Impairment

Dr. Hansen treated Wallis for knee pain, she received cortisone injections, was prescribed a knee brace, and was diagnosed with pseudogout.  After the ALJ's decision, Huntsinger opined that Wallis's condition made walking difficult and, as a result, Wallis argues her knee impairment is severe.

Wallis established the existence of a knee impairment through signs, symptoms and a diagnosis and the ALJ should have considered what effect the impairment had on Wallis's ability to perform work activities.  See SSR 96-4p (individual must establish impairment by objective medical evidence).  Nevertheless, any error was harmless.  The ALJ properly found Wallis's

Page 14 - OPINION AND ORDER

testimony regarding the extent of her knee impairment not entirely credible, as I conclude below. The ALJ found it noteworthy that Wallis was ambulating and functioning at a part-time job in December 2005, and in 2006 she reported doing all her own cleaning and shopping and that she could lift 35 pounds and walk up to one mile before she needed to rest. Additionally, in a February 2007 questionnaire, Wallis reported working as a housekeeper and liking to fish, walk and dance.

In crafting Wallis's RFC, the ALJ further relied on the two-day functional capacity examination performed by physical therapist Berkovitch, who tested Wallis's physical abilities. In that evaluation Berkovitch concluded Wallis was capable of light work, with limitations on repetitive squatting and crouching. The ALJ adopted these limitations in the RFC. <u>Lewis v. Astrue</u>, 498 F.3d 909, 911 (9th Cir. 2007) (step two error harmless if ALJ considered limitations at step four). Although Wallis argues Huntsinger's opinion should trump Berkovitch's, the ALJ is required to evaluate the medical evidence and determine which has the most probative value. SSR 06-03p. Neither source is an "acceptable medical source," but Berkovitch's opinion is well-supported with findings from the physical exam Wallis underwent over a period of two days. It was entirely appropriate for the ALJ to give great weight to that examination. Accordingly, any error the ALJ made in failing to evaluate whether Wallis's knee impairment was severe was harmless.

B.    <u>Mental Impairments</u>

Wallis asserts the ALJ erred in concluding her depression was "not severe." Wallis argues the ALJ improperly considered an "unsigned" evaluation from 2003, that he mischaracterized Dr. Spendal's analysis, and ignored a 2002 diagnosis of Somatoform Disorder,

Mixed Personality Disorder and a Cognitive Disorder.  She also contends the ALJ failed to consider the combined impact of pain and depression.

Contrary to Wallis's assertion, the 2003 evaluation is not unsigned.  It was signed by Frank Lahman, Ph.D., on May 8, 2003.  Tr. 427.  In that report, the consulting psychologist reviewed the record and found no medical evidence of any limitations from any psychological impairment.  This 2003 analysis was confirmed by Dr. Hennings's analysis in 2006.

Additionally, the ALJ accurately reported that Dr. Spendal diagnosed major depressive disorder, recurrent, moderate, with a GAF of 60.  While Wallis takes issue with the ALJ's characterization of the GAF score as suggesting "mild to moderate symptoms," a score of 60 misses the "mild" category by a single point.  The ALJ correctly noted that Dr. Spendal indicated "the claimant had some mild attentional and interpersonal deficits," which Wallis believes the ALJ should have treated as work limitations.  Tr. 14.  As a result of these "deficits," Dr. Spendal recommended:  presentation of information that is not too fast; the use of visual and verbal training; the potential need for constructive feedback; and the recognition that pain and medications might affect attention and processing speed.  Dr. Spendal indicated, however, that these suggestions were almost all intended to compensate for Wallis's "mild attention problems." Tr. 467, 468.

At first glance I would agree with Wallis that the recommendations Dr. Spendal made appear to suggest Wallis's impairment would have more than a minimal effect on Wallis's ability to work.  The ALJ, however, properly underscored that Dr. Spendal's recommendations came from her finding that Wallis suffered from *mild* attentional problems.  The ALJ complied with the regulations that required him to "rate the degree of [Wallis's] functional limitation [based

Page 16 - OPINION AND ORDER

on]:  Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3).  The regulations direct that if the ALJ rates the limitation in the first three categories as "none" or "mild" and "none" in the fourth, the impairment is not severe unless the evidence indicates there is more than a minimal limitation in the claimant's ability to perform basic work activities.  Id. at §§ 404.1520a(d)(1) and 416.920a(d)(1).  Here, the ALJ found Wallis had no limitations in her activities of daily living, mild limitations in social functioning mostly due to anger problems, and mild problems with concentration, persistence or pace due to *mild* attentional deficits.  The ALJ's conclusions are supported by substantial evidence.  As a result, the ALJ did not err in concluding Wallis's mental impairments were not severe.  However, as I note below, the ALJ should have considered the limitations identified by Dr. Spendal, even though non-severe, in crafting Wallis's RFC.

Finally, Wallis complains the ALJ neglected to include Dr. Spendal's diagnosis of pain disorder, and did not comment on the 2002 evaluation performed by Howard L. Deitch, Ph.D., that Dr. Spendal referenced in her report.  Given the ALJ's compliance with §§ 404.1520a and 416.920a, I do not see any harm from the ALJ's failure to include Dr. Spendal's additional diagnosis at step two.  The additional diagnosis, without additional functional limitations, does not undermine the ALJ's analysis.  Similarly, Dr. Spendal mentioned only receiving portions of Dr. Deitch's 2002 report, Dr. Deitch could have performed the psychological evaluation prior to Wallis's onset date of disability, and Dr. Spendal specifically rejected the past diagnosis of Cognitive Disorder.  Nevertheless, this information further buttresses my conclusion that Wallis's mental impairments, though non-severe, should have been factored into Wallis's RFC.

Page 17 - OPINION AND ORDER

In sum, the ALJ did not err in concluding Wallis's mental impairments were not severe but, as I set forth below, he should have considered Dr. Spendal's full report in formulating Wallis's RFC.

C.    Other Impairments

Wallis generally contends the ALJ erred in not identifying her remaining impairments as severe, including:  asthma, incontinence, headaches, panic attacks, cervical/neck and shoulder pain, hand problems, and anger.

As an initial matter, there is no evidence Wallis's asthma imposed any functional limitations on her ability to work.  An impairment that is under control cannot support a finding of disability.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1992).

With regard to her complaints of incontinence and headaches, Wallis received only sporadic treatment for these problems, there is no evidence she suffered from such impairments for a period of 12 months or longer, or that any medical signs or findings explain these symptoms.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A) (claimant required to show a "medically determinable physical or mental impairment" "which has lasted or can be expected to last for a continuous period of not less than 12 months"); §§ 423(d)(5) and 1382c(a)(3)(H) (claimant's burden to furnish medical evidence showing existence of medical impairment). Similarly, with regard to panic attacks, I found no evidence that Wallis complained of panic attacks, or that any examining or treating provider was aware of such an impairment.  The ALJ did not err in failing to evaluate whether these conditions were severe impairments.

As for Wallis's neck, back and shoulder pain, the ALJ evaluated Wallis's condition as a chronic pain disorder, thereby including all such impairments.  Indeed, he specifically noted

Wallis's complaints to Dr. Livingston of "pain and swelling in her hands, and pain in her low back and shoulders," which Dr. Livingston diagnosed as fibromyalgia. Tr. 14. The ALJ relied on Berkovitch's examination, who tested Wallis's physical abilities, and folded those limitations into Wallis's RFC. The fact that the ALJ did not separately evaluate these impairments was not error.

Similarly, in the context of evaluating whether Wallis had any severe mental impairments, the ALJ summarized several reports indicating Wallis had trouble containing her anger. Tr. 15. As a result, he considered her anger problems in the context of evaluating her mental impairments. However, just as I have concluded above with respect to Dr. Spendal's findings on Wallis's functional limitations, although the ALJ properly characterized any anger problems as indicating mild limitations in social functioning, he should have accounted for Wallis's anger in the RFC.

The ALJ did not err in the way he treated these other impairments Wallis has identified.

III.    Consideration of Wallis's Testimony

Wallis challenges the ALJ's conclusion that Wallis's "statements concerning the intensity, persistence and limiting effects" of her symptoms are not credible "to the extent they are inconsistent with the" RFC. Tr. 17-18.

Wallis testified that she ran out of breath for "probably 10" minutes when she climbed stairs and when "I'm talking a long sentence[.]" Tr. 25. She reported having asthma attacks once a month when she got sick, that she suffered from pseudogout that lasted up to a month every four months unless she obtained "injections on time[.]" Tr. 26. She "can't move it at all. I scream in pain and usually I'm hospitalized." Id. She experienced headaches in cycles where

she got the headache in the afternoon, it turned into a migraine lasting five or six hours, and then it went away for a few days or weeks.  She reported she was unable to turn her head or tip her head back; she got dizzy and got headaches.  She reported having accidents from diarrhea six or seven times in the last year and that she went to the bathroom ten times a day as a result.  She had to pry her fingers off the phone and had trouble letting go of the steering wheel due to swelling. She reported knee pain, depression, anger problems a couple times a week, panic attacks once a month that lasted all day, she fell down once every few months, her muscles spasmed every day and the spasm could last all day, her muscles cramped daily and lasted three or four days at a time, and she took five or six hot baths in a day to relieve the cramping.  She commented that she had lost eight or nine jobs due to her fibromyalgia and particularly due to cramping in her hands. When her attorney asked her whether she could do any of her past work, she said, "No . . . because I have more limitations now because of my leg, you know.  I can't do repetitive–I haven't had, just everything I've done has just been pretty much repetitive type work."  Tr. 40.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  Id.  The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence

undermines the testimony." Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001).  General

findings are insufficient to support an adverse credibility determination and the ALJ must rely on

substantial evidence.  Id.  "[U]nless an ALJ makes a finding of malingering based on affirmative

evidence thereof, he or she may only find an applicant not credible by making specific findings

as to credibility and stating clear and convincing reasons for each." Robbins v. Soc. Sec.

Admin., 466 F.3d 880, 883 (9th Cir. 2006).

The ALJ relied on the medical record, pointing out that the cervical spine x-ray showed

only mild degenerative disc change and the Lyrica was helping Wallis's fibromyalgia pain.

Although the ALJ cannot reject subjective pain testimony solely because it was not fully

corroborated by objective medical evidence, medical evidence is still a relevant factor in

determining the severity of the pain and its disabling effects.  Rollins v. Massanari, 261 F.3d 853,

857 (9th Cir. 2001).

Wallis asserts the ALJ neglected to consider neck pain and fibromyalgia pain in

combination, but it is unclear how this would change the outcome.  The ALJ found Wallis's

fibromylgia and chronic pain to be a severe impairment, and accommodated any resulting

limitations in Wallis's RFC.  Wallis also contends the record does not support the ALJ's

characterization of Dr. Kelly's observation that the Lyrica provided "much relief," but the record

directly supports the ALJ's finding.

Additionally, the ALJ found Wallis's activities demonstrated her impairments were not as

severe as she said they were.  She told Dr. Livingston in December 2005 that she was working at

a part-time job.  In February 2006, she was taking care of pets and taking care of herself,

including cooking, cleaning, and shopping.  At that time she indicated she could lift 35 pounds

and walk up to one mile without needing rest.  In February 2007, Wallis reported working as a

housekeeper, with hobbies that included fishing, walking and dancing.  Although Wallis argues

she has good days and bad days, that she takes rest breaks to help with swelling, and that a part-

time job does not negate disability, the ALJ's decision is a rational interpretation of the evidence.

The ALJ gave clear and convincing reasons to find Wallis not entirely credible about the extent

of her symptoms.  <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1039 (9th Cir. 2008) (ALJ may consider

ordinary techniques of evaluating credibility, including daily activities).

Finally, the ALJ referred to the findings of Berkovitch and Dr. Jensen to conclude the

record supported a finding that Wallis was capable of light work and that she was not as limited

as she reported.  Wallis challenges the ALJ's use of Berkovitch's examination since Berkovitch

is not an acceptable medical source, and insists the ALJ should have instead considered treating

therapist Linn's opinion and the evaluation prepared by Huntsinger.  Similarly, Wallis challenges

the ALJ's reliance on Dr. Jensen, as a nonexamining, agency physician.

Wallis does not have an opinion from an acceptable medical source indicating she has

functional limitations that preclude her from working.  Berkovitch, Linn, and Huntsinger are

considered "other" medical sources under the Agency's regulations.  The ALJ is entitled to

consider other medical sources to evaluate the severity of an impairment and how it affects a

claimant's ability to work.  20 C.F.R. § 404.1513(d).  In considering the opinions of other

medical sources, the ALJ should consider:  (1) how long the source has known the claimant and

how frequently the source has seen the claimant; (2) whether the opinion is consistent with other

evidence; (3) the degree to which the source presents relevant evidence supporting an opinion;

(4) how well the source explains the opinion; and (5) whether the source has a specialty or area of expertise related to the claimant's impairments.  SSR 06-03p.

The ALJ concluded Berkovitch's opinion was entitled to great weight as it was consistent with Dr. Jensen's report (who, as a non-examining consulting physician, had reviewed the medical evidence) and consistent with Wallis's own reports about her abilities.  These are acceptable reasons to give the opinion great weight.

The ALJ concluded Linn was not an acceptable medical source, that her opinions were not supported by objective findings, and was inconsistent with the objective medical and opinion evidence in the record.  He relied instead on Dr. Spendal's well-supported conclusion that Wallis could work.  Again, it was entirely appropriate to rely on Dr. Spendal's extensive evaluation over Linn's opinion.

Finally, Huntsinger's opinion, which is additional evidence presented to the Appeals Council but not seen by the ALJ, does not undermine my conclusion that the ALJ's decision is supported by substantial evidence.  Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000) (additional evidence may be considered in determining if the ALJ's denial of benefits is supported by substantial evidence).  Huntsinger opines Wallis needed to lie down three to four times in an eight-hour day and that her ability to maintain a normal work pace was very poor. Although Huntsinger has a long treatment relationship with Wallis, her opinions are not supported by relevant evidence and are inconsistent with Wallis's activities and other medical evidence.  She gives as support for her conclusions Wallis's osteoarthritis in the left knee and degenerative disc disease.  However, x-rays showed only mild degenerative disc disease. Furthermore, Berkovitch performed an extensive examination, recognized Wallis's trouble with

her knee, identified functional limitations that would accommodate the pain, and concluded Wallis could work.

The ALJ did not err in finding Wallis's' symptoms not as severe as she said they were.

III.    Lay Witness Statements

The ALJ found the statements made by Wallis's aunt, Shirley Hill, consistent with Wallis's statements.  He concluded, however, that the statements were "largely based on the claimant's self-report to the witness and are not consistent with the medical evidence of record and the claimant's own report of her abilities[.]"  Tr. 19.  Hill reported seeing Wallis two days a week, with daily phone contact.  According to Hill, "[O]n quite a few days [Wallis] is in tears from pain," she did not sleep well due to the pain and stress, she could stand and sit for an hour at a time, and she had a hard time keeping a job due to her physical limitations.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. Stout v. Commissioner of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).  Because Hill's statements are nearly identical to those given by Wallis, and since the ALJ did not err in concluding that Wallis's testimony about her limitations was not fully credible, given the physical therapist's examination and Wallis's activities, the ALJ's decision not to fully credit Hill's statements is supported by substantial evidence.  Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (acceptable to reject spouse's testimony for same reasons given for claimant if spouse's testimony was similar to claimant's complaints); Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) (a legitimate reason to discount lay testimony is that it conflicts with medical evidence).  The ALJ did not err.

IV.   <u>Whether the RFC Captures Wallis's Limitations</u>

Wallis finally contends the ALJ failed to comply with SSR 96-8p, which requires the ALJ to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." She asserts she is unable to perform full-time work due to her fatigue and chronic pain. She also reiterates her argument that the ALJ neglected to consider all of her impairments. Finally, she contends the ALJ ignored the physical therapist's findings related to reduced strength and endurance in her shoulders, decreased grip strength in the right upper extremity, and decreased motion and strength of the left knee.

For the reasons stated above, the ALJ properly rejected Wallis's reports of debilitating pain and fatigue. Additionally, the RFC accounts for the physical therapist's findings in limiting overhead reaching and limiting stooping, crouching, crawling, kneeling, and climbing ramps and stairs.

Nevertheless, I agree with Wallis that the ALJ neglected to account for limitations identified by Dr. Spendal. Having purportedly accepted Dr. Spendal's opinions in evaluating the extent of Wallis's mental impairments, the ALJ should have considered the contents of the entire report. Although the ALJ properly concluded Wallis's mental impairment was not severe, the ALJ is required to consider all medially determinable impairments, including those that are not severe when he crafts an RFC. 20 C.F.R. §§ 404.1545(a)(2) and 416.1382c(a)(3)(G). Although, as the ALJ reported, Dr. Spendal found Wallis capable of working, the limitations Dr. Spendal identified should have been considered by the VE and the ALJ in evaluating whether Wallis could perform her past work. Additionally, the ALJ should have considered whether or how Wallis's documented anger problems would affect her ability to perform her past work.

Page 25 - OPINION AND ORDER

Reformulation of Wallis's RFC and testimony from a VE will resolve Wallis's final complaint that the ALJ neglected to consider the effect her medications had on her ability to concentrate and process information quickly. Dr. Spendal's specific recommendations account for the effects pain and pain medication had on Wallis's attention and processing speed.

V.    <u>Remand for Further Findings</u>

The court has the discretion to remand the case for additional evidence and findings or to award benefits. <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076-77 (9th Cir. 2002). The court should credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited. <u>Id.</u>

Given my conclusion that the ALJ should have accounted for Dr. Spendal's recommendations in formulating Wallis's RFC as well as Wallis's documented anger problems, a remand is appropriate for further evaluation of Wallis's RFC and to hear testimony from a VE about whether Wallis can perform her past work or other work in the national economy.

**CONCLUSION**

The decision of the Commissioner is reversed. This action is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the record as explained above. Judgment will be entered.

IT IS SO ORDERED.

Dated this _____6th_____ day of December, 2010.


    ___/s/ Garr M. King_____
    Garr M. King
    United States District Judge